UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

TABITHA MUELLER,                    )    Case No.: 1:05 CV 560
                                    )
        Plaintiff                   )
                                    )
    v.                              )    JUDGE SOLOMON OLIVER, JR.
                                    )
J.P. MORGAN CHASE & CO., *et al.*,  )
                                    )
        Defendants                  )    <u>ORDER</u>

On February 11, 2005, Plaintiff Tabitha Mueller ("Plaintiff" or "Mueller") filed the within

case, alleging that Defendants J.P. Morgan Chase & Co., Bank One Corporation, and Marcelo

Torres[1] (collectively, "Defendants") interfered with Plaintiff's rights under the Family and Medical

Leave Act ("FMLA" or the "Act") and retaliated against, and ultimately terminated, her for

exercising her FMLA rights.  Now pending before the court is Defendants' Motion for Summary

Judgment.  (ECF No. 67.)  For the reasons that follow, Defendants' Motion is hereby granted in part

and denied in part.

## I.  FACTS AND PROCEDURAL HISTORY

In or about February, 2002, Plaintiff began working as a relationship banker at Bank One,

---

[1]    Defendants state that, due to a corporate merger, the correct Defendants are
JPMorgan Chase Bank, N.A., the successor-interest to Bank One Corporation,
and Marcelo Torres.  (*See* Defs.' Answer to Pl.'s First Am. Compl. 1; ECF No.
30; Defs.' Mot. for Summ. J. 1, 2, ECF No. 67; *see also* Defs.' Ex. A, ECF No.
67-2.)

NA's Gordon Square Branch in Cleveland, Ohio. (Dep. of Tabitha Mueller 19:15-16, ECF No. 69) ("Mueller Dep."); Not. of Placement, Defs.' Ex. B., ECF No. 70-2.) Her original duties included opening savings accounts, checking accounts, certificates of deposits, and providing loans to customers, and she later also began working with annuities, estate planning, mutual funds, and investments. (Mueller Dep. at 15:24-25, 17:5-8, 22-25.) In addition to her salary, Plaintiff was eligible for monthly bonuses, which were calculated by how many accounts she opened and the dollar amount that she brought into the bank. (*Id.* at 16:4-15.) Plaintiff was hired by Clare Brilla ("Brilla"), the District Manager at the time. (*Id.* at 15:13-16.) In February or March, 2003, Marcelo Torres ("Torres") was hired as the Branch Manager of the Gordon Square location. (First Dep. of Marcelo Torres 17:7-9, 22:18, ECF No. 79) ("Torres First Dep.") Torres was Plaintiff's direct supervisor throughout the relevant time period. (First Aff. of Marcelo Torres ¶ 4, Defs.' Ex. C, ECF No. 67-4) ("Torres First Aff.") Plaintiff received annual performance reviews; Brilla conducted Plaintiff's 2002 review, and Torres conducted her 2003 review. (Mueller Dep. at 22:2-4.)

### A. Plaintiff's First FMLA Leave

One of Plaintiff's sons has juvenile diabetes, and Plaintiff often missed work to take him to the doctor or to care for him. (*Id.* at 38:24-17; 44:9-12, 55:20-56:5.) Torres repeatedly complained to Diane Houghton ("Houghton"), the Assistant Branch Manager, about Plaintiff missing work for family emergencies. (Dep. of Diane Houghton 33:11-36:14, ECF No. 81) ("Houghton Dep.") Torres also complained to Brilla, the District Manager at the time. (Dep. of Clare Brilla 26:12-20, ECF No. 84-15, at 3) ("Brilla Dep.") Plaintiff contends that in or around October, 2003, Torres began complaining to her that she was missing time from work to care for her son. (Aff. of Tabitha Mueller ¶ 6, ECF No. 84-2) ("Mueller Aff.") Plaintiff's son's doctor advised Plaintiff to apply for

FMLA leave.  (Mueller Dep. at 56:1-8.)  Plaintiff maintains that she asked Torres at least twice to

provide her with the necessary paperwork to file for intermittent leave under the FMLA.  (Mueller

Aff. ¶ 7-8; Mueller Dep. at 56:25-57:16.)  Human Resources ("H.R.") told Plaintiff that only her

manager, Torres, could make the initial request for FMLA leave.  (Mueller Aff. ¶ 8; Mueller Dep.

at 120:12-20.)  In addition, Brilla stated that it was the manager's responsibility to make the initial

call to H.R.  (Brilla Dep. at 25:24-26:1.)  Plaintiff complained to her co-workers "every day" that

Torres was not timely processing her FMLA request.[2]  (Houghton Dep. at 42:13-14; *see id.* at 41:21-

43:14.)  Houghton asked Torres about it twice, and he replied that he had called H.R.  (*Id.* at 41:24-

42:1; 42:7-9, 18-21.)  While Plaintiff was waiting for Torres to initiate her FMLA leave, she was

allowed to take time off, although Torres advised her that " it would not be good for [her] to take

the time off but to do what [she] had to do."  (Mueller Dep. at 59:4-7.)

     Plaintiff maintains that, in or around December, 2003,[3] Torres provided her with the

---

[2]    As background, Plaintiff also states that "[t]his was not the first time that Torres
failed to provide [her] with paperwork to process a claim."  (Mueller Aff. ¶ 11.)
Torres had previously delayed processing her unrelated workers' compensation
claim for an injury that occurred on December 2, 2003.  (*Id.*)  Her co-worker,
Amy Pendleton, testified that Plaintiff repeatedly complained to her that Torres
was not submitting the necessary paperwork.  (Pendleton Dep. at 46:7-48:12.)

[3]    At Plaintiff's deposition on October 10, 2005, she stated that she "finally got the
paperwork in October."  (Mueller Dep. at 57:22-58:6.)  Plaintiff did not make any
corrections to her deposition transcript during the thirty-day correction period
provided for by Fed. R. Civ. P. 30(e).  On June 27, 2006, over two months after
Defendants filed for summary judgment, Plaintiff filed an affidavit stating that her
deposition transcript contained a "typographical error," and that she actually
received the FMLA paperwork from Torres "at the end of December 2003 or
early 2004."  (Mueller Aff. ¶¶ 9-10.)  Defendants argue that this affidavit should
be disregarded.  Defendants cite *Lanier v. Bryant*, 332 F.3d 999, 1004 (6th Cir.
2003), for the rule that after a summary judgment motion has been filed, a party
may not create a factual issue by filing an affidavit that contradicts her earlier
deposition testimony.  The court finds that Plaintiff's affidavit does not squarely

-3-

necessary paperwork for her to apply for FMLA leave.  (Mueller Aff. ¶¶ 9-10; Pl.'s First Am. Compl. ¶ 10; Pl.'s Compl. ¶ 10.)  H.R. sent the paperwork to Torres, who then gave it to Plaintiff. (Mueller Dep. at 58:4-6.)  Plaintiff and her doctor then completed the paperwork and turned it in directly to H.R.  (*Id.* at 58:24-25, 58:7-12.)  A computer printout entitled, "FMLA Program For Mueller, Tabitha R." indicates: "DATE REQUEST RECEIVED 01/02/2004."  (FMLA Program For Mueller, Tabitha R. 1, Pl.'s Ex. 2, ECF No. 84-3.)  The printout also states that H.R. received the "medical leave application and documentation" on January 13, 2004, and approved the request on January 15, 2004.  (*Id.* at 2.)  In addition, Plaintiff submitted a letter from Bank One to Plaintiff, dated January 15, 2004, which stated that her intermittent leave was approved for the period from January 2, 2004, through July 2, 2004.  (Pl.'s Ex. 10, ECF No. 84-11.)

Plaintiff alleges that even after her FMLA leave was approved, Torres repeatedly insisted that she provide him with a doctor's excuse for every absence so that he could put it in her personnel file.  (Mueller Aff. ¶ 12; Mueller Dep. at 65:18-67:13; Dep. of Amelia Pendleton 24:7-25; 49:1-3,

---

contradict her deposition testimony.  Elsewhere in her deposition, Plaintiff states that October, 2003, is when she "applied" for FMLA leave (Mueller Dep. at 55:20-23) and when she "started trying to get the forms."  (*Id.* at 120:6-8.)  In addition, in both her original and amended Complaint, Plaintiff alleges that "[f]inally, in or around December 2003 Defendant Torres provided Plaintiff with the FMLA application and information."  (Pl.'s First Am. Compl. ¶ 10, ECF No. 28; Pl.'s Compl. ¶ 10, ECF No. 1.)  Consequently, although the court notes that Plaintiff should have discovered and corrected the transcript error earlier, the inconsistency appears to be an honest mistake, not an intentional factual contradiction.  *See Mich. Pork Producers v. Campaign for Family Farms*, 229 F. Supp. 2d 772, 779 (W.D. Mich. 2002), *vacated on other grounds* ("While it is true that it is improper for a witness to contradict deposition testimony by an affidavit or declaration for the purpose of avoiding summary judgment, this rule does not apply to a witness who is simply clarifying or expanding upon previous testimony.") (internal citation omitted).  Therefore, the court finds that while Plaintiff is not allowed to change her deposition testimony pursuant to Rule 30(e), her affidavit should not be stricken.

-4-

ECF No. 82) ("Pendleton Dep.")  Torres kept his own list and file of Plaintiff's absences, which he had Houghton sign, yet he did not keep a list or file for any other employee. (Houghton Dep. 55:13-56:17.)  Plaintiff told Torres that her doctor had informed her that doctor's notes were not required for FMLA absences, and Torres replied that company policy was to obtain a note when an employee missed a certain number of days. (Mueller Dep. at 70:15-71:19.)  Whenever Torres asked, Plaintiff would provide him with a note from her doctor. (Mueller Dep. at 67:14-68:5.)  In late January or early February, 2004, Plaintiff spoke to H.R., who instructed Plaintiff to tell Torres that he did not need medical certification for FMLA-approved absences. (Mueller Dep. at 68:8-21; 120:1-5; 121:23-122:1; 122:10-11.)

According to Plaintiff, in either January or February, 2004, Torres asked her and her co-worker Amelia, known as Amy, Pendleton ("Pendleton") to notarize a document or documents outside the presence of the signatory. (*Id.* at 69:10-13; 115:21-119:1.)  Plaintiff states that Torres became upset when they refused to do so. (Mueller Aff. ¶ 13; Mueller Dep. at 69:5-69:13; 115:21-119:1).  Pendleton corroborates this account. (Pendleton Dep. at 49:20-54:3.)  Torres contends that he merely asked Plaintiff whether a certain document required notarization. (Torres First Aff. ¶ 5.)  In her deposition, Plaintiff testified that notarizing a document improperly was both illegal and against company policy, and that two employees had recently been fired for doing so. (Mueller Dep. at 70:12-14; 117:17-19; *see* Brilla Dep. at 48:3-14.)

Sometime in February, 2004, Plaintiff reported Torres' conduct regarding the doctor's notes and the notary incident to Brilla. (Mueller Aff. ¶¶ 14-15; Mueller Dep. at 69:5-18.)  Later that month, Plaintiff met with Brilla, Torres, and Houghton to discuss these issues. (Mueller Dep. at 68:22-69:13, 70:4.)  According to Plaintiff, Brilla told Torres at the meeting that anything he

obtained or requested from Plaintiff, or any files he kept regarding Plaintiff, had to be sent to H.R., who would then ask Plaintiff directly for documentation if they wanted it.  (*Id.* at 69:7-69:11, 70:1-4.)  Plaintiff maintains that Brilla told Torres that nothing could be notarized unless the signatory was present.  (*Id.* at 69:25-70:1.)  After the meeting, Plaintiff says that Torres no longer asked her to bring doctor's notes for her absences, and that no disciplinary action was taken against Torres.  (*Id.* at 70:5-7; Mueller Aff. ¶ 16.)  Brilla testified that she did not discipline Torres about the notary incident because she believed his explanation.  (Brilla Dep. at 45:19-48:20.)

Torres admitted that he was not trained in FMLA policies (Torres First Dep., 29:3-6, 32:4-20, ECF No. 79; Second Dep. of Marcelo Torres 136:6-10, ECF No. 80) ("Torres Second Dep.") and stated that Mueller was the only one of his employees who took FMLA leave (Torres Second Dep. at 197:3-197:16).

In March, 2004, Sean Barrett ("Barrett") replaced Brilla as District Manager.  (Aff. of Sean Barrett ¶ 4, ECF No. 67-5) ("Barrett Aff.")

## B. Plaintiff's Performance Review

Torres testified that in March, 2004, he asked Jane Black ("Black"),[4] who was the temporary Senior H.R. Business Rep. (Dep. of Jane Black 11:25, 17:1-10, ECF No. 78) ("Black Dep."), to look over and approve Plaintiff's 2003 performance review because he wanted to discuss his concerns about giving her a negative rating.  (Torres Second Dep. at 140:8-16.)  Torres testified that Black agreed with the review (*id.*), although Black testified that she had no recollection of being involved

---

[4]    Black's deposition transcript reveals that she did not recall much about Mueller's employment or her FMLA leave in general.  (Black Dep. at 18:13-21:14; 23:9-26:20; 27:6-28:20; 28:10-14; 29:24-30:4; 30:21-32:7; 33:20-22; 35:16-36:7; 36:19-37:1; 37:21-38:3; 40:22-25.)

with Plaintiff's review (Black Dep. at 20:20-22:14).  At the end of March, 2004, Torres and Houghton presented and discussed the 2003 performance review with Plaintiff.  (Mueller Dep. at 22:25-23:9.)  Plaintiff received a rating of "needs improvement" in six out of twenty-two categories and a rating of "meets expectations" in fourteen out of twenty-two categories.[5]  (Retail Banking Performance Review, Pl.'s Ex. 4, ECF No. 84-5.)  The review gave Plaintiff an overall rating of "needs improvement," which meant that she was not eligible to receive a pay raise.  (*Id.* at 2; *see* Mueller Aff. ¶ 17; Mueller Dep. at 22:20-29:4.)  According to Plaintiff, prior to this review, Torres had never advised Plaintiff of any problems regarding her job performance.  (Mueller Aff. ¶ 17.)  At his deposition, Torres explained that, although Plaintiff had met her work performance goals (called Product Value Codes or "PVCs"), he had other issues with Plaintiff that resulted in her poor rating:

> [S]he had a lot of issues that were not PVC related that caused a lot a [sic] trouble in the office that really affected the way the branch could be run . . . . Her overall attitude; her attendance when it was not pertaining to FMLA or her son, either being out for problems with her husband, problems with her mother, problems with her sister; she was unreliable.

(Torres Second Dep. at 139:13-16; 140:10-12, 21-24.)

To contest her unfavorable evaluation, Plaintiff sent a memorandum to Black, dated April 1, 2004, detailing Plaintiff's concerns about the review.  (Pl.'s Internal Mem., Pl.'s Ex. 3, ECF No. 84-4.)  In the memorandum, Plaintiff stated that she agreed with some of the unfavorable ratings and disagreed with others.  She also stated:

> My overall review worked out to be a needs improvement and I do not feel this is fair or accurate.

---

[5]  One category was rated "not applicable."  (*See* Torres First Dep. at 65:17-66:5.)

. . .

> I know that [Torres] was not happy that I called HR about my
> FEMLA [sic] because he kept putting it off . . . . And I also feel that
> . . . our conversation with the D[istrict] M[anager] . . . has also
> affected his attitude towards me because he had wanted myself or my
> assistant to notarize documents after the fact so my [various
> supervisors] and myself sat down and discussed any problems I had
> and problems he had . . . but during this conversation the things he
> is marking me for now were not brought up and if I was doing so
> poorly from last year[']s review time to this year[']s review time
> should I not have had some sort of indication as to what [areas] he
> felt I needed to work on to prevent a poor review.

(*Id.*) (all caps omitted.) Plaintiff maintains that Black responded to her by saying that there was

nothing Black could do and that Torres' supervisors were upholding the review. (Mueller Aff. ¶ 19.)

However, Black had no independent recollection of receiving this memorandum or making this

statement. (Black Dep. at 22:19-24:8.) Plaintiff filed a grievance with H.R. regarding the review,

but she did not follow up on it because she went on a medical leave of absence[6] soon after. (Mueller

Dep. at 29:5-30:12.)

### C. Plaintiff's Fee Reversal

On February 25, 2002, when Plaintiff was first hired, she signed the bank's Account and

System Access Acknowledgment for New Employees, which includes the following rule:

> The following actions may result in disciplinary action up to and
> including termination of your employment:
> . . .
> 2. Making any adjustments or changes to the financial information
> on your own account, or that of a friend, relative, acquaintance, or
> co-worker. Examples of adjustments or changes include, but are not
> limited to, processing deposits, processing withdrawals, processing

---

[6] In her deposition, Plaintiff testified that, during the relevant time period, she took other absences in addition to the FMLA leaves involved in this lawsuit. (*See* Mueller Dep. at 38:7-41:10.)

-8-

credits or debits, and modifying or waiving fees.

(Defs.' Redacted Ex. F, ECF No. 70-3) (bold omitted.)  Similarly, Plaintiff signed the bank's Retail

Employee Standards on March 11, 2003.  (Defs.' Ex. E, ECF No. 67-6.)  One rule states:

> An employee may not process <u>any</u> transaction or perform
> maintenance (such as address, name or ownership changes) on
> his/her personal account, or the account of a close personal friend or
> relative.  Violations by employees such as, but not limited to, the
> following may result in corrective action up to and including
> termination:
> . . .
> Processing fee reversals or waivers for themselves or family
> members' accounts

(*Id.* at 3) (bold omitted.)  During the relevant time period, the bank's policy allowed employees to

perform automatic fee reversals when a holder of a premier client account was charged an overdraft

fee.  (Houghton Dep. at 73:2-74:17; Mueller Aff. ¶ 26.)  A premier client account is defined as

"someone that has a relationship with Bank One of $35,000 in checking, savings, CDs, investments,

loans, credit cards."  (Houghton Dep. at 72:21-23; *see* Mueller Dep. at 76:13-15.)  Plaintiff states

that she had "had supervisor authority" to do fee reversals for premier clients herself without

obtaining manager approval.  (Mueller Dep. at 77:5-10.)

In March, 2004, Dominic Rodriguez ("Rodriguez"), a premier account holder, contacted

Plaintiff and asked her to reverse an overdraft fee of $112.  (Mueller Aff. ¶ 20; Mueller Dep. at

75:18-76:22.)  At the time, Plaintiff's sister, Faith, also known as Nikki, King ("King"), was the

caregiver for Rodriguez's child; they began dating sometime after the fee reversal.  (Mueller Aff.

¶ 21; Mueller Dep. at 75:5-17; 77:18-23.)  Rodriguez and King held a joint account at the bank as

well as each holding separate accounts.  (Mueller Aff. ¶ 22.)  Plaintiff avers that the bank had

previously permitted Plaintiff to open the joint checking account for Rodriguez and King without

-9-

repercussion.[7]  (Mueller Aff. ¶ 27.)  Pendleton states that she is "pretty sure" that Plaintiff opened the joint account.  (Pendleton Dep. at 58:23-24.)  Pendleton further stated that she did not known whether Torres was aware of what Plaintiff had done, and that Plaintiff was never disciplined for this transaction even though it was against bank policy.  (*Id.* at 58:20-61:14.)  Although Defendants do not state whether or not Plaintiff opened the joint account with the bank's knowledge or permission, they do submit the Consumer Signature Card dated November 25, 2002, which indicates that Plaintiff opened the joint account.  (Consumer Signature Card, Defs.' Ex. B, ECF No. 86-3.)  Torres testified that this card was in the bank's possession during the time he supervised Plaintiff and that it was kept in the normal course of business.  (Second Aff. of Marcelo Torres ¶¶ 5-6, Defs.' Ex. C, ECF No. 86-4) ("Torres Second Aff.")  Pendleton stated that Plaintiff was listed as the personal banker for Rodriguez and King.  (Pendleton Dep. at 38:19.)

Plaintiff says that when she accessed Rodriguez's account to perform the fee reversal, her computer screen did not indicate that this was the joint account on which her sister was also listed, and that Plaintiff was not aware that her sister was listed on this account.  (Mueller Aff. ¶¶ 23-24; Mueller Dep. at 75:22-24.)  Plaintiff also states that no other managers were in the bank at the time. (Mueller Aff. ¶ 25; *see* Houghton Dep. at 87:15-17.)  Plaintiff reversed the $112 overdraft fee on the joint Rodriguez-King account.  (Mueller Aff. ¶¶ 25-26; *see* Banking Center P&L, Defs.' Ex. G, ECF No. 67-8.)

During this time period, Barrett told Torres to review the appropriateness of fee reversals as a way of making the branch more profitable.  (Barrett Aff. ¶ 5.)  Torres asked Houghton to review

---

[7]     Plaintiff states in her deposition that Pendleton opened the joint account in Plaintiff's presence because Plaintiff was not allowed to open it.  (Mueller Dep. at 125:12-127:4.)

-10-

the March, 2004, "P & L Report," which listed all the fee reversals.  (Torres First Aff. ¶ 6.)

Houghton testified that she brought Plaintiff's fee reversal to Torres' attention because it was one

of the larger amounts.  (Houghton Aff. ¶¶ 5-6; Houghton Dep. at 77:9-78:13; 79:7-17; 81:22-86:18.)

Houghton said that she was not aware of which employee had processed the transaction when she

first brought it to Torres' attention, and that "after clicking through several computer screens,"

Torres and Houghton discovered that Plaintiff had processed the transaction.  (Houghton Aff. ¶ 6.)

Houghton said that she knew King was Plaintiff's sister.  (*Id.*)  Houghton also testified that if she

had been in the office on the day that Plaintiff reversed Rodriguez's fee, Houghton would have

completed the fee reversal if Plaintiff had asked her.  (Houghton Dep. at 87:7-88:1.)

Plaintiff maintains that in early April, 2004, Torres, and possibly Houghton,[8] verbally

reprimanded her for the fee reversal.[9]  (Mueller Aff. ¶ 30; Mueller Dep. at 93:3-96:14.)  Plaintiff

responded by stating that at the time she did not remember or realize that her sister was on the

account.  (Mueller Aff. ¶ 29.)  Plaintiff states that Torres told her that she "could no longer perform

any functions on the account," to which she agreed.  (*Id.* ¶ 30.)  Houghton heard Torres state that

---

[8]      In her deposition, Plaintiff stated that only Torres was present (Mueller Dep. at 93:6-7, 94:1-8), while her affidavit states that both Houghton and Torres were present during the reprimand (Mueller Aff. ¶ 28).  Torres stated that he confronted Mueller alone.  (Torres First Aff. ¶ 8.)  Houghton first stated that she was unsure whether she was present.  (Houghton Dep. at 89:4-5; 90:4-6.)  She later stated that Torres called Plaintiff into Houghton's office and Houghton began the confrontation.  (*Id.* at 89:1-3; 89:10-90:16.)

[9]      Torres stated that he discovered the fee reversal in late April or early May, 2004, when Houghton brought it to his attention.  (Torres First Aff. ¶ 6; Torres First Dep. at 86:20-25; 87:7-10; 87:24-88:13.)  Houghton stated that she confronted Plaintiff the same day, or the day after, that she discovered the fee reversal (Houghton Dep. at 88:2-8), but that she did not know when this took place.  (*Id.* at 88:16-25.)

-11-

"this might come back and harm you."  (Houghton Dep. at 89:23-90:7.)  Torres stated that he

confronted Plaintiff about the fee reversal incident, but simply expressed to her that he did not know

what discipline the bank would impose.  (Torres First Aff. ¶ 8.)  At the bank, there is a policy that

managers must document verbal reprimands.  (*Id.* ¶ 9; *see* Barrett Aff. ¶ 10.)  Torres denied that he

verbally reprimanded Plaintiff at this confrontation, and pointed out that there is no evidence of a

verbal reprimand in Plaintiff's personnel file.  (Torres First Aff. ¶ 9.)  Torres stated that he informed

Black of the fee reversal in early May, 2004.  (*Id.* ¶ 8.)  Black testified that she could not recall how

or when she found out about the fee reversal, but that she thought it was not until Plaintiff was out

on her second FMLA leave, which began on May 31, 2004.  (Black Dep. at 30:21-32:21; 36:3-15;

42:18-43:3.)

The fee reversal was not mentioned to Plaintiff again until September 7, 2004, two days prior

to Plaintiff's termination. (Mueller Aff. ¶ 31.)

### D. Plaintiff's Second FMLA Leave

On May 27, 2004, Plaintiff separately informed Torres and Black that her husband was

missing and that she was having a mental breakdown.  (*Id.* ¶¶ 32-33.)  Either that day or the next,

Plaintiff's husband was admitted to the hospital for a drug overdose.  (Mueller Dep. at 41:11-42:15.)

According to Plaintiff, when she told Torres about her need to take FMLA leave, Torres "responded

by telling me that I should just quit and collect welfare."  (*Id.* ¶ 35; *see* Mueller Dep. at 113:5-

115:6.)  Plaintiff reported this to H.R.  (Pl.'s Ex. 11, ECF No. 84-12.)  The H.R. entry for June 8,

2004, at   2:38 p.m. states that Plaintiff "INDICATES . . . THAT MGR INITIALLY

RECOMMENDED SHE QUIT HER JOB LAST WK WHEN SHE WAS GOING ON LEAVE."

(*Id.*)  Plaintiff also testified that Torres suggested that she call the bank's Employee Assistance

Program ("EAP"), which she did.  (Mueller Dep. at 42:41:17-42:18.)  EAP suggested that Plaintiff apply for a medical leave.  (*Id.* at 42:19-23.)

According to Plaintiff, Black told her that Black would process the paperwork for Plaintiff to take leave (Mueller Aff. ¶ 34), although Black testified that she had no memory of speaking to Plaintiff (Black Dep. at 26:9-20).  Plaintiff called H.R., and was told that Torres would have to get the paperwork for her.  (Mueller Dep. at 61:6-7.)  Plaintiff applied for and was able to take leave immediately beginning May 31, 2004.  (*Id.* at 61:18-62:8.)  Once the paperwork was approved, it "related back" to her first absence.  (*Id.*)

### E. Plaintiff's Termination

There is some conflicting testimony regarding when the fee reversal incident was reported to H.R. and Corporate Security.  Defendants' process for reporting an employee ethics issue was to either contact Corporate Security directly, or to contact H.R., who would then contact Corporate Security.  (Black Dep. at 28:25:29:7.)  Although Torres alleges that he reported the incident to Black in early May, 2004, and left a message for Andrew Sekula ("Sekula"), a Corporate Security investigator, the same day (Torres First Dep. at 87:18-89:18), the testimony of both Black and Sekula contradict this account.  Black testified that it was her practice to call Corporate Security immediately upon being informed of an allegation of employee misconduct.  (Black Dep. at 28:15-20; 29:8-16; 42:18-43:3.)  Black said that she usually left a voice mail message for Sekula, and that he would call her back within a few days.  (Black Dep. at 29:17-30:20.)  Black also testified that she believes that she learned about Plaintiff's fee reversal incident while Plaintiff was already on leave, and that she called Sekula immediately. (*Id.* at 35:19-36:15.)

Plaintiff submitted what she maintains are Sekula's notes.  The notes state: "On May 28,

-13-

2004 HR Jane Black informed RI of a possible Code of Conduct issue involving RB Tabitha Mueller

. . . . RI contacted the BCM Marcelo Torres on Tuesday June 1, 2004." (Management Memo, Pl.'s

Ex. 12, ECF No. 84-13.) At his deposition, Sekula testified that the first time he learned of the fee

reversal was when Torres contacted him on May 28, 2004 (Dep. of Andrew Sekula 13:9-15, 15:1-11,

ECF No. 77) ("Sekula Dep.") and that Sekula investigated the incident and called Torres "in very

early June" to schedule an interview with Plaintiff (*id.* at 18:16-19:20).  At that point, Torres

informed Sekula that Plaintiff was either on leave or that she was about to go on leave, so they

decided that Sekula would interview her upon her return to work.  (*Id.* at 20:5-25.)

Plaintiff returned from FMLA leave on September 7, 2004.  (Mueller Dep. at 84:1-21.)

Around 10:15 a.m., Plaintiff was called in to Torres' office, where Sekula was also present.  (*Id.* at

86:8-19.) Sekula asked Plaintiff to explain her account of what happened regarding the fee reversal.

(*Id.* at 86:21-22.)  He wrote out her narrative, which he then read to her, and she signed.  (*Id.* at

86:22-89:9.)  Plaintiff's statement, as read by Sekula at his deposition, is as follows:

> This morning I discussed and reviewed transaction documents which
> relate to the DDA account of Dominic E. Rodriguez.  In late March
> 2004, I recall that I processed an overdraft fee reversal in the amount
> of $112.  As I further recall, Mr. Rodriguez is a premier client and
> would have qualified for the fee reversal.  I did not discuss the
> reversal with either my BCM or ABCM.  At the time of the reversal,
> I failed to recall or realize that my sister, Faith N. King, was a
> cosigner on the account as well as Dominic Rodriguez.  In that I
> failed to realize that consideration, I never intended to violate the
> code of conduct.

(Defs.' Redacted Ex. J, ECF No. 70-4; Sekula Dep. at 27:23-29:14.)  Plaintiff then asked why she

was being asked about the fee reversal at that point when it had been addressed previously in April,

and Sekula told her that he had only learned of the incident at the end of May.  (Mueller Dep. at

86:23-87:7.)  Later that morning, Plaintiff was told that she was suspended with pay pending further

-14-

investigation.  (*Id.* at 89:10-91:4.)  On September 8, 2004, Sekula reported the results of his

interview with Plaintiff and his investigation to Barrett, the District Manager.  (Aff. of Andrew

Sekula ¶ 10, Defs.' Ex. I, ECF No. 67-10) ("Sekula Aff.")  Barrett, possibly in conjunction with

Black, made the decision to terminate Plaintiff.[10]  (Barrett Aff. ¶ 8; Black Dep. at 33:22-34:22.)

Torres testified that he did not take part in that decision.  (Torres Second Dep. at 192:15-193:14.)

Barrett said that, prior to his decision to terminate Plaintiff, Barrett "was unaware that Plaintiff had

complained to Brilla or Torres about anything" in February, 2004.  (Barrett Aff. ¶ 9.)  On

September 9, 2004, Torres called Plaintiff to inform her that she had been terminated due to the fee

reversal incident.  (Mueller Aff. ¶ 45; Mueller Dep. at 91:7-10.)

  Sekula and Black each testified that the bank terminated any employee who had improperly

reversed a fee for a relative, and Black testified that she did not believe that terminating the

employee was discretionary.  (Sekula Dep. at 36:21-23; Black Dep. at 34:19-35:1.)  Sekula stated

that approximately 50 to 100 employees in his district have been terminated for such incidents in

the past ten years, and that he did not recall any employee who had received a lesser discipline.

(Sekula Dep. at 36:17-20; 36:24-37:18.)  Black also stated that any employee's improper fee reversal

that she dealt with always resulted in termination, and that she did not recall any employee who had

not been terminated for such conduct. (Black Dep. at 33:5-7; 33:23-34:6.)  In addition, Barrett stated

that:

---

[10]     Barrett's affidavit does not mention that Black participated in the decision.  He
stated, "I decided to terminate Plaintiff's employment.  I based my decision to
terminate Plaintiff's employment solely on Plaintiff's fee reversal on her sister's
account and nothing else." (Barrett Aff. ¶ 8.)  Black states that she participated in
the decision by recommending that Plaintiff be terminated.  (Black Dep. at 32:22-
33:22.)

> [a]t Chase, verbal reprimands are documented in writing. I am not aware of any documented verbal reprimands with respect to Plaintiff's fee reversal on her sister's account. As Chase's District Manager, I would not have permitted Torres, or any of Plaintiff's superiors, to merely give Plaintiff a verbal reprimand for her fee reversal on her sister's account. At the time I terminated Plaintiff's employment in September 2004, I believed that Chase terminated the employment of any employee who reversed fees for a relative, and I had terminated the employment of other employees for this reason before and since Plaintiff's termination. I have always terminated employees in my chain of command for reversing fees for a relative.

(Barrett Aff. ¶ 10.) Brilla, the former district manager, also stated that the bank's "policy and practice" was "to terminate employees who process fee reversals on the account of a family member." (Aff. of Clare Brilla ¶ 7, Defs.' Ex. K, ECF No. 67-12.)

On February 11, 2005, Plaintiff filed a Complaint, alleging violations of the FMLA. (Pl.'s Compl.) She alleges that Defendants interfered and/or restrained her from taking FMLA leave and that Defendants retaliated against her for taking leave by improperly terminating her upon her return from an FMLA-approved absence. (Pl.'s First Am. Compl. ¶ 24.) On April 17, 2006, Defendants filed the pending Motion for Summary Judgment. (ECF No. 67.)

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941,

-16-

943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil,* 188 F.3d 365, 369 (6th Cir. 1999).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id*.

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

### III. LAW AND ANALYSIS

-17-

## A. Theories of Recovery Available Under the FMLA

The FMLA entitles an employee to take up to twelve weeks of unpaid leave each year because of the employee's serious health condition or that of a close relative. 29 U.S.C. § 2612(a)(1). FMLA leave may be taken in blocks of time (e.g., for the birth of a child or to recover from surgery) or intermittently (e.g., for a recurring health condition). *Id.* § 2612(b). Upon return from FMLA leave, the employee is entitled to be restored either to her original position or to an equivalent position. *Id.* § 2614(a)(1).

Two distinct theories of recovery arise under the FMLA: interference (also called "entitlement") and retaliation (also called "discrimination"). *See Arban v. West Pub. Co.*, 345 F.3d 390, 400-401 (6th Cir. 2003) (explaining both theories of recovery).

According to the statute, an employer is prohibited from *interfering* with an employee's FMLA rights:

> (a) Interference with rights.
> (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title.

29 U.S.C. § 2615(a)(1). In addition, an employer is prohibited from *retaliating* against an employee who complains of an employer's violation:

> [a](2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title.
>
> (b) Interference with proceedings or inquiries. It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual –
> (1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this title;
> (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this title; or

-18-

(3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this title.

*Id.* § 2615(a)(2) & (b). Section 2617(a) imposes liability on "[a]ny employer who violates [29 U.S.C. § 2615]," and provides an individual right of action to sue in state or federal court. 29 U.S.C. § 2617(a)(1), (a)(2).

The implementing regulation outlines interference violations (29 C.F.R. § 825.220(a)(1)) and retaliation violations (*Id.* § 825.220(a)(2)) and provides examples of prohibited employer conduct. For example, conduct constituting employer interference with employee's rights includes "not only refusing to authorize FMLA leave, but *discouraging an employee from using such leave.*" § 825.220(b) (emphasis added). Likewise, retaliation or discrimination against employees who have taken FMLA leave takes many forms. The regulation states, in pertinent part:

> [I]f an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, *employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions*; nor can FMLA leave be counted under "no fault" attendance policies.

29 C.F.R. § 825.220(c) (emphasis added). The regulation also emphasizes that an employer violates the FMLA when it violates either the FMLA statute itself or the implementing regulations. 29 C.F.R. § 825.220(b). Finally, even where an employer violates the FMLA, an employee is not entitled to relief unless she can show that she "has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide*, Inc., 535 U.S. 81, 89 (2002); *Cavin v. Honda of Am. Mfg.*, 346 F.3d 713, 726 (6th Cir. 2003) (quoting *Ragsdale*); *see* 29 U.S.C. § 2617(a)(1)(A)(i)(I).

### B. Plaintiff's Claims

At the outset, the court must determine whether Plaintiff is pursuing her claims under the

theory of interference, retaliation, or both.  Plaintiff's Complaint cites 29 U.S.C. § 2615(a)(1), which

covers interference, but she does not cite the statutory provisions that cover retaliation.  (Pl.'s First

Am. Compl. ¶ 25.) However, the Complaint also refers to "Defendants' discriminatory acts" and

"retaliatory conduct." (*Id.* ¶¶ 24, 26.)  In their Motion for Summary Judgment, Defendants assume

that Plaintiff had pled a retaliation claim by splitting the alleged violations into both retaliation and

interference claims.  (Defs.' Mot. for Summ. J. at 10-14, 18-19 (retaliation), 15-16 (interference).)

In her Opposition Brief, Plaintiff cites both interference and retaliation regulations and contends that

Defendants have violated both.  (Pl.'s Opp'n Br. at 22-24.)  Yet Plaintiff challenges the burden of

proof that Defendants employ for the retaliation claim, contending that all of the alleged violations

(or, alternatively, all of the violations that occurred prior to Plaintiff's termination) are subject to the

standard used for interference claims.  (*Id.* at 25-26.)  Nevertheless, Plaintiff continues to use the

term "retaliation" throughout her brief.  (*See, e.g.*, *id.* at 9) ("Despite the overwhelming evidence

that Plaintiff was *retaliated* against and ultimately terminated for taking [FMLA] leave . . . all

Defendants have moved for summary judgment contending that they have no legal responsibility

over the *retaliation* and termination against Plaintiff.") (emphasis added).  Therefore, the court finds

that Plaintiff's claims are as follows:

- Plaintiff's allegation that Torres did not timely initiate Plaintiff's FMLA paperwork upon request (for which Plaintiff cites 29 C.F.R. § 825.220[a](1) & (b)) is an interference claim;
- Plaintiff's allegation that Torres harassed Plaintiff when she tried to take her approved FMLA leave (for which Plaintiff cites § 825.220(b) & (c)) is both an interference and a retaliation claim;
- Plaintiff's allegation that Torres gave Plaintiff a poor performance review that took into account her absences in the fall of 2003 when she was waiting for FMLA approval (for which Plaintiff cites 825.220(c) as well as cases that involve only interference claims) is a

-20-

retaliation claim;[11]

- Plaintiff's allegation that Defendants retaliated against Plaintiff for complaining to H.R. and her co-workers about Torres' behavior in regard to the notary incident and requesting doctor's excuses for approved absences (for which Plaintiff cites § 825.220[a](2)) is a retaliation claim; and

- Plaintiff's allegation that Defendants wrongly terminated Plaintiff after she returned from FMLA leave (for which Plaintiff does not cite any statute or regulation) is a retaliation claim.

(*See* Pl.'s Opp'n Br. at 22-25.) Therefore, two violations will be analyzed under the interference theory and four violations will be analyzed under the retaliation theory.

## C. Interference

### 1. Establishing an Interference Claim

In an interference inquiry, an employer's intent is irrelevant. *Arban*, 345 F.3d at 401 ("Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.") (quotation omitted).

To prevail on an FMLA interference claim, a plaintiff must prove by a preponderance of the

---

[11]     Defendants correctly point out that Plaintiff discussed this allegation for the first time in her Opposition Brief, without including it her Complaint. (Defs.' Reply Br. at 4.) However, a Complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a). As the court finds that the Complaint alleges both interference and retaliation claims, and as Defendants argue both types of claims in their Motion for Summary Judgment, Defendants had adequate notice about both claims. The fact that Plaintiff lists some facts in her Complaint does not preclude her from including other facts in her brief to support each claim. The Sixth Circuit has held that a "[c]omplaint need not set down in detail all the particularities of a plaintiff's complaint against a defendant . . ." *Carrasco v. NOAMTC Inc.*, 124 Fed. Appx. 297, 301 (6th Cir. 2004). Indeed, the purpose of discovery is to determine all the underlying facts. In the instant case, various depositions demonstrate that the issue of Plaintiff's performance review was fully explored. (*See, e.g.*, Mueller Dep. at 22:25-23:9; Torres Second Dep. at 140:8-16.) Therefore, the court may properly address the performance review issue at the summary judgment stage.

-21-

evidence[12] that (1) she is an eligible employee as defined in the Act; (2) the defendant is an employer as defined in the Act; (3) she was entitled to FMLA leave; (4) she gave proper notice of her intention to take leave; and (5) the defendant denied her FMLA benefits to which she was entitled or otherwise interfered with her FMLA rights.  *Hoge v. Honda of Am. Mfg.*, 384 F.3d 238, 244 (6th Cir. 2004); *Cavin*, 346 F.3d at 719.  As stated above, the plaintiff must also prove that she has been prejudiced by the violation.  *Ragsdale*, Inc., 535 U.S. at 89; *Cavin*, 346 F.3d at 726.

## 2. Alleged Interference Violations

The court finds that Plaintiff alleges that Defendants interfered with her FMLA leave in two ways: (1) Torres did not timely initiate Plaintiff's FMLA paperwork upon request; and (2) Torres harassed Plaintiff when she tried to take her approved FMLA leave.  (Pl.'s Opp'n Br. at 22-23.)  In the instant case, the parties' dispute centers on the fifth element[13] – whether Defendants interfered

---

[12]     Plaintiff correctly states that the burden of proof for an interference claim is preponderance of the evidence.  (Pl.'s Opp'n Br. at 26) (citing *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112 (9th Cir. 2001).  Although the Sixth Circuit has not explicitly stated that the McDonnell Douglas framework does not apply to interference claims, *see* discussion, *infra* at Part III.D, it recently applied McDonnell Douglas to a retaliation claim and not to the accompanying interference claim, while also pointing out that the employer's intent is relevant only to a retaliation claim, not to an interference claim.  *Edgar v. JAC Prods.*, 443 F.3d 501, 507-508 (6th Cir. 2006) (using the term entitlement rather than interference).  In addition, district courts in the Sixth Circuit have also held that McDonnell Douglas does not apply to interference claims.  *See, e.g.*, *Schmauch v. Honda of Am. Mfg., Inc.*, 295 F. Supp. 2d 823, 831 (S.D. Ohio Dec. 11, 2003); *Collins v. United States Playing Card Co.*, 2006 U.S. Dist. LEXIS 80927, *15 (S.D. Ohio Nov. 6, 2006). *But see Petsche v. Home Fed. Sav. Bank*, 952 F. Supp. 536, 538 (N.D. Ohio 1997).  Because much of *Petsche*'s progeny actually involves retaliation claims, and because the reasoning in *Batchelder* and *Edgar* is persuasive, this court finds that McDonnell Douglas is not appropriate for Plaintiff's interference claim.

[13]     *See* discussion, *infra* at Part III.C, finding that Torres is an employer under the Act.  Defendants do not contest that the bank is an employer under the Act.  All

-22-

with Plaintiff's FMLA benefits.

*a. Timeliness of Torres' Processing of Plaintiff's First FMLA Request*

Plaintiff alleges that, in regard to her first FMLA leave to care for her son, Torres did not timely initiate Plaintiff's FMLA paperwork upon request, thereby restraining her from exercising her FMLA rights in violation of 29 C.F.R. § 825.220(b).  (Pl.'s Opp'n Br. at 22-23.)  Viewing the facts in the light most favorable to Plaintiff, beginning in October, 2003, Plaintiff repeatedly asked Torres to provide her with the necessary forms to request leave, which he did not provide until December, 2003.  A computer printout from H.R. indicates that the FMLA request was received on January 2, 2004, and that H.R. received Plaintiff's application on January 13, 2004, and approved it on January 15, 2004.  (Pl.'s Ex. 2, ECF No. 84-3.)  In addition, a letter from Bank One to Plaintiff, dated January 15, 2004, states that her intermittent leave was approved for the period of January 2, 2004, through July 2, 2004.  (Pl.'s Ex. 10, ECF No. 84-11.)  This evidence suggests that Torres did not initiate Plaintiff's FMLA paperwork until January 2, 2004; that Plaintiff turned in the completed paperwork on January 13, 2004; that her leave was approved on January 15, 2004; and that the effective date related back to the date on which the request had been made.

Defendants argue that they did not interfere with Plaintiff's use of FMLA leave because her leave was ultimately approved.  *See Bila v. Radioshack Corp.*, 2004 U.S. Dist. LEXIS 24649, *23 (E.D. Mich. Nov. 22, 2004) ("[A] plaintiff suffers no FMLA injury when []he receives all the leave []he requests.") (quoting *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1275 (11th Cir. 1999)).  In addition, Defendants point out that Plaintiff admitted that she was not denied any time off between the time she requested FMLA leave and the time the leave was approved.

other elements are undisputed.

-23-

Consequently, Defendants argue that Plaintiff was not denied any benefits, and that she therefore cannot show that she was prejudiced by any alleged delay in processing her FMLA request.

The court disagrees.  Even where an employee's FMLA leave is eventually approved, an employer's delay in effectuating the leave constitutes a violation.  *See Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 454 (6th Cir. 2005) (finding violation where employer delayed responding to employee's request for maternity leave, and remanding to district court for determination of whether prejudice existed).  Although Plaintiff was allowed to take leave while she waited for the FMLA leave to be approved, she was discouraged from doing so.  In addition, a genuine issue of material fact exists as to whether the poor performance rating she received due to her non-FMLA absences was based on the absences she took while waiting for FMLA paperwork.  (*See* Pl.'s Opp'n Br. at 23-24); *see* discussion, *infra*, at Parts III.D.3(b)(i) & 4(a) & 5(a).  If so, then the three months that Plaintiff had to wait for Torres to provide the paperwork prejudiced Plaintiff by causing her to take additional absences, which then resulted in a poor performance review, thereby precluding her from earning a pay raise.  *See Schmauch v. Honda of Am. Mfg., Inc.*, 295 F. Supp. 2d 823, 829 (S.D. Ohio 2003) (finding that employee's FMLA leave caused employer to extend employee's "attendance improvement program," which limited the number of absences he could take and thus led to his termination).

Moreover, the fact that Plaintiff's second FMLA leave, in May, 2004, was timely approved (*see* Mueller Aff. ¶¶ 33-36; Mueller Dep. at 61:1-62:8; Defs.' Mot. for Summ. J. at 4) shows how quickly FMLA leave is approved once requested.  Likewise, the fact that FMLA leave relates back to the date requested strongly suggests that the first FMLA paperwork was *not* initiated in October, 2003, as Defendants contend, because if it had been, her leave would have related back to October,

-24-

2003 (as opposed to January 2, 2004). Consequently, a question of fact exists as to whether Plaintiff could have taken FMLA leave as early as October, 2004, if her paperwork had been initiated earlier. As such, a genuine issue of material fact exists as to whether Torres interfered with Plaintiff's right to take FMLA leave by failing to timely process her request and whether she was prejudiced thereby. Therefore, Defendants' Motion for Summary Judgment is denied as to Plaintiff's interference claim based on allegations that Torres delayed processing Plaintiff's FMLA request.

*b. Harassment of Plaintiff Regarding Her FMLA Leave*

After receiving approval for intermittent FMLA leave in January, 2004, Plaintiff alleges that Torres discouraged her from taking her approved FMLA leave by repeatedly asking for a doctor's note each time she took leave, making inappropriate comments to her, and asking her to improperly notarize a document. Plaintiff also contends that Torres' requests for doctor's certificates were sometimes more frequent than permitted by the regulations, which allow an employer to ask for recertification of an employee's medical condition no more than every thirty days. 29 C.F.R. § 825.308.

Even construing all facts in favor of Plaintiff, the court finds that Plaintiff has not shown that she was prejudiced by Torres' behavior (*see* Defs.' Reply Br. at 4) because Plaintiff continued to take FMLA leave and her second request for FMLA leave was approved. Plaintiff also concedes that Torres' behavior ceased after Plaintiff confronted Brilla, who spoke to Torres. For these reasons, the court grants summary judgment for Defendants on Plaintiff's interference claim based on Torres' alleged harassment. As Plaintiff also alleges that these facts constituted retaliation, the court will analyze them again under that standard.

**D. Retaliation**

-25-

1. Establishing a Retaliation Claim

Unlike an interference claim, an employer's intent or motive is "an integral part" of a retaliation inquiry. *Edgar v. JAC Prods.*, 443 F.3d 501, 508 (6th Cir. 2006). Contrary to Plaintiff's contention that the McDonnell Douglas framework cannot be used "for the actions that occurred prior to [Plaintiff's] termination" (Pl.'s Opp'n Br. at 26), Defendants correctly state that the Sixth Circuit uses the McDonnell Douglas framework to analyze all retaliation claims that are based on indirect evidence. (Defs.' Mot. for Summ. J. at 10); *see Edgar*, 443 F.3d at 508 (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001)); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Defendants correctly argue that a mixed-motive analysis is also applicable (Defs.' Mot. for Summ. J. at 14), despite Plaintiff's arguments to the contrary[14] (Pl.'s Opp'n Br. at 29-30).

The McDonnell Douglas framework is a three-part analysis. First, an employee must prove, by a preponderance of the evidence, a prima facie case that she was retaliated against because she used FMLA leave. *Skrjanc*, 272 F.3d at 315; *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Next, if the plaintiff makes out a prima facie case, then the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the discharge. *Skrjanc*, 272 F.3d at 315. Finally, if the defendant has met its burden of production, then "the McDonnell Douglas framework – with its presumptions and burdens – is no longer relevant." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-511 (1993). At that point, the plaintiff must

---

[14]     Plaintiff cites *Cavin*, 346 F.3d 713, for the proposition that "mixed-motive analysis is inappropriate under the FMLA." (*See* Pl.'s Opp'n Br. at 29-30.) Yet *Cavin* does not discuss the mixed-motive analysis at all – nor does it even involve a retaliation claim.

persuade the fact-finder, by a preponderance of the evidence, that "unlawful discrimination was the real reason for the adverse employment action." *Gibson v. City of Louisville*, 336 F.3d 511, 514 (6th Cir. 2003); *see Skrjanc*, 272 F.3d at 315. The court notes that the reference to McDonnell Douglas as "burden shifting" is a misnomer because, although the defendant bears the *burden of production* at the second step, the plaintiff bears the ultimate *burden of persuasion* throughout the analysis. *See Gibson*, 336 F.3d at 513-514; *St. Mary's Honor Ctr.*, 509 U.S. at 507.

The plaintiff need not prove that discrimination was the *sole* reason for her termination to prevail. *Gibson*, 336 F.3d at 513. For example, if the defendant proffers a non-discriminatory reason for the adverse employment action, then the plaintiff must show that the employer's non-discriminatory reason is just a pretext to mask discrimination. *Skrjanc*, 272 F.3d at 315. If, instead, the defendant proffers both discriminatory and non-discriminatory reasons, then the mixed-motive analysis applies. *Gibson*, 336 F.3d at 513 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)); *Maxwell v. GTE Wireless Serv. Corp.*, 121 F. Supp. 2d 649, 658 (N.D. Ohio 2000) (citing district courts in the Sixth Circuit that have applied the mixed-motive analysis to FMLA claims). Under the mixed-motive framework, the plaintiff must prove by a preponderance of the evidence that discrimination was "a motivating factor" in the adverse employment decision. *See Gibson*, 336 F.3d at 513-514 (citing *Desert Palace*, 539 U.S. at 93). A defendant can then avoid liability by setting forth an affirmative defense that it would have taken the same action even without the discriminatory factor. *Lampkin v. Ernie Green Indus.*, 2005 U.S. Dist. LEXIS 5451, *4 (N.D. Ohio Mar. 30, 2005); *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005). Whether a discriminatory reason for the adverse action exists (thereby triggering the mixed-motive analysis) or whether a plaintiff must simply argue against a defendant's proffered non-discriminatory reason, the inquiry

-27-

at the fact-finding stage remains the same: to determine whether the defendant's *real* reason was unlawfully discriminatory. *Gibson*, 336 F.3d at 514 ("Regardless of the framework used for presenting the proof, the underlying substantive law is the same.").

Thus, in the instant case, Plaintiff can prevail on her retaliation claim by proving either that: (1) Defendants' non-discriminatory reasons for the adverse employment actions are pretextual; or (2) under the mixed-motive framework, despite any valid non-discriminatory reasons, the FMLA leave was a motivating factor in the adverse employment actions. Conversely, Defendants can prevail by showing either: (1) a valid non-discriminatory reason for the adverse employment action; or (2) under the mixed-motive framework, even in the absence of a discriminatory reason, they would have made the adverse actions anyway.

## 2. Alleged Retaliation Violations

Defendants contend that Plaintiff's termination is the only adverse employment action that Plaintiff alleges in her Complaint. (Defs.' Mot. for Summ. J. at 11.) However, as stated previously, Plaintiff did not have to list every fact in her Complaint. (*See* discussion, *supra* at note 9.) Although Plaintiff does not clearly state which actions she alleges under her interference claim and which under her retaliation claim, and does not apply the proper legal analysis to each claim, the court finds Plaintiff's retaliation claim to include the following allegations: (1) Torres gave Plaintiff a poor performance review that took into account her absences in the fall of 2003, during the time that she was waiting for FMLA approval; (2) Defendants wrongly terminated Plaintiff after she returned from FMLA leave; (3) Torres harassed Plaintiff by requiring her to provide medical excuses for

every FMLA-approved absence;[15] and (4) Defendants retaliated against Plaintiff for complaining to H.R. and her co-workers about Torres' behavior by not disciplining him.  (Pl.'s Opp'n Br. at 22-25.)

### 3. Plaintiff's Prima Facie Case of Discrimination

A plaintiff's burden in establishing a prima facie case of discrimination is not intended to be "onerous."  *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 870 (6th Cir. 2001) (quoting *Burdine*, 450 U.S. at 253).   To establish a prima facie case, a plaintiff must prove by a preponderance of the evidence that:  (1) she availed herself of a protected FMLA right by notifying her employer of her intent to take leave; (2) she suffered an adverse employment action; and (3) there was a causal connection between the exercise of her FMLA rights and the adverse employment action.  *Edgar*, 443 F.3d at 508; *Skrjanc*, 272 F.3d at 314; *St. Mary's Honor Ctr.*, 509 U.S. at 506. The parties dispute both the second and third elements.

### a. Adverse Employment Action

An adverse employment action is one that causes a "materially adverse change in the terms and conditions of [plaintiff['s]] employment."  *McMillian v. Potter*, 130 Fed. Appx. 793, 796 (6th Cir. 2005) (quotation omitted and inside brackets added).  An adverse employment action can "include demotions, reductions in salary or job responsibilities, offers of early retirement or continued employment on terms less favorable than the employee's former status, and harassment by the employer calculated to encourage the employee's resignation."  *Weigold v. ABC Appliance Co.*, 105 Fed. Appx. 702, 708 (6th Cir. 2004) (citation omitted).

---

[15]     For example, Plaintiff asserts that Torres' requests for recertification constitute "retaliatory" action.  (*See* Pl.'s Opp'n Br. at 23.)

### i. Performance Review

In their Reply Brief, Defendants argue that Plaintiff's poor performance review does not constitute an adverse employment action. However, the case on which Defendants rely for this proposition is distinguishable. In *Primes v. Reno*, the Sixth Circuit held that the plaintiff's "mid-range performance evaluation of 'fully successful' . . . is not the type of adverse employment action contemplated by Title VII." 190 F.3d 765, 767 (6th Cir. 1999). Yet the instant Plaintiff received a "needs improvement" rating, not a satisfactory mid-range rating as in *Primes*. In addition, the prima facie case in *Primes*, which involved Title VII rather than the FMLA, required the plaintiff to "show[] that the Department of Justice treated differently a member of a non-protected group similarly situated in an analogous situation." *Id.* at 766. As stated above, a prima facie case of discrimination under the FMLA has no such requirement. Furthermore, another Title VII case specifically distinguished *Primes* by holding that a plaintiff's negative performance review *did* constitute an adverse employment action because, unlike *Primes*, the plaintiff showed the possibility that the review caused him to suffer "material change" in his employment. *Byrd v. Stone*, 2000 U.S. App. LEXIS 441, *9 (6th Cir. Jan 6, 2000). In the instant case, it is undisputed that Plaintiff did not receive a salary increase due to the poor performance review. Accordingly, the court holds that Plaintiff's performance review constitutes an adverse employment action.

### ii. Termination

Defendants do not contest the fact that Plaintiff's termination is an adverse employment action.

### iii. Torres' Harassment

Plaintiff maintains that Torres harassed Plaintiff when she tried to take her approved FMLA

-30-

leave by repeatedly asking for unnecessary medical excuses.  However, there is no evidence before the court showing that the harassment rises to the level of causing a material harm in Plaintiff's employment terms or conditions.  As such, Plaintiff has not shown an adverse employment action, and therefore fails to make her prima facie case.  Therefore, the court hereby grants summary judgment for Defendants as to Plaintiff's retaliation claim based on Torres' harassment and Defendants' failure to discipline Torres.

### iv. Plaintiff's Complaints About Torres

Plaintiff appears to allege that Defendants retaliated against Plaintiff by not disciplining Torres for retaliating against her for complaining to H.R. and her co-workers about Torres' behavior regarding the medical excuses and the notary incident.  However, Defendants' purported failure to discipline Torres does not constitute an adverse employment action against Plaintiff.  Accordingly, the court hereby grants summary judgment for Defendants as to Plaintiff's retaliation claim based on Defendants' failure to discipline Torres.  Therefore, the only remaining allegations in support of her retaliation claim are her negative performance review and her termination.

### b. Causal Connection

To establish a causal connection between the exercise of her FMLA rights and the adverse employment action, a plaintiff "must show that an employee's use of FMLA leave was a 'significant factor' motivating the retaliatory action." *Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 675 (S.D. Ohio 2005) (citation omitted).  A plaintiff's burden to demonstrate a causal connection "between an employee's FMLA leave and termination is 'minimal,' and courts are expected to 'draw reasonable inferences' from any credible evidence" that the plaintiff puts forth. *Id.* at 676 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)).  The parties disagree on whether

-31-

the temporal proximity between an employee's exercise of FMLA rights and the adverse employment action is sufficient, by itself, to constitute a causal connection.  (*See* Defs.' Mot. for Summ. J. at 11-12; Pl.'s Opp'n Br. at 27-28; Defs.' Reply Br. at 7-8.)  The *Dage* court summarized the state of Sixth Circuit law:

> The Sixth Circuit has, in some recent cases, suggested that temporal proximity must be coupled with some evidence of retaliatory conduct before any connection may be inferred.  However, the Sixth Circuit has declined to specify precisely how much additional evidence is required.  Moreover, there are other recent employment retaliation cases, including FMLA cases, indicating that temporal proximity alone may support an inference of causal connection.

*Dage*, 395 F. Supp. 2d at 676 (cases cited for each proposition omitted).  As Plaintiff relies not only on temporal proximity, but also on evidence of other retaliatory conduct, the court need not determine whether temporal proximity alone is sufficient to constitute a causal connection.

### i. Performance Review

Plaintiff contends that Torres retaliated against her by giving her a negative performance review for the 2003 calendar year in violation of 29 C.F.R. § 825.220(c), which states that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions . . . ."  *See Cavin v. Honda of Am. Mfg.*, 346 F.3d 713, 726 (6th Cir. 2003) ("[A] termination based only in part on an absence covered by the FMLA, even in combination with other absences, may still violate the FMLA.") (quotation omitted).  Torres testified that although Plaintiff met her work performance goals, he had other issues with Plaintiff related to her absences.  Of course, an employer may take into account an employee's non-FMLA absences without violating § 825.220(c).  However, Plaintiff alleges that Torres improperly took into account her absences from October, 2003, to December, 2003, which occurred after she had asked

Torres to initiate the FMLA paperwork and before her leave was approved in January, 2004.  (*See* Pl.'s Opp'n Br. at 23-24.)  If Torres did consider Plaintiff's absences during this period, then Plaintiff's poor review would be causally connected to the amount of time it took for her FMLA leave to be initiated and approved.  Put simply, if the FMLA leave had been approved in October when Plaintiff first requested the paperwork, then Plaintiff's absences from October, 2003, through December, 2003, would have been covered under the FMLA, which raises the possibility that she would have received a more positive performance review, thereby making her eligible for a pay raise.

Plaintiff submits the list of her absences from November 23, 2002, through March 24, 2004. (*See* Pl.'s Exs. 5-6, ECF Nos. 84-6, 84-7.)  Only the absences in 2003 are relevant to the performance review at issue.  The absences in this time frame are labeled with the following five categories: "approved paid", "approved unpaid", "illness paid", "vacation", and "personal hol." (*See id.*)  Although neither party analyzes these absences or explains the meaning of the various categories, the record shows that Plaintiff was absent from work for a total of forty-nine days in 2003 and that seventeen of those absences occurred in the last three months of the year.  In other words, 35% of her absences took place in the last 25% of the year.  Also, Plaintiff had ten "approved unpaid" absences in the last three months of the year compared to only nine "approved unpaid" absences throughout the other nine months of the year.  Consequently, some evidence suggests that Torres took Plaintiff's absences form October to December into account in the performance review. In addition, at Plaintiff's meeting with management regarding Torres' requests for medical notes for her FMLA leave as well as the notary incident in February, 2004, Torres did not mention any of the factors that he listed on the performance review one month later.  Consequently, it is possible that

-33-

Torres retaliated against Plaintiff for having reported his behavior to their supervisors by giving Plaintiff a poor performance review.  (*See* Pl.'s Internal Mem. at 2.)

Therefore, the court finds that a jury could reasonably conclude that Torres retaliated against Plaintiff for her complaints about him by giving her a negative performance review that unlawfully took into account absences that could have been covered by FMLA if her leave had been approved earlier.  Therefore, Plaintiff has shown a causal connection and has made out her prima facie case.

### ii. Termination

Plaintiff points out two instances of temporal proximity: (1) her termination occurred two days after she returned from FMLA leave; and (2) Torres reported the fee reversal on the same day that Plaintiff requested her second FMLA leave.  (*Id.* at 32.)  The court is not persuaded that the first instance of temporal proximity is significant because it is clear that Sekula could not interview Plaintiff while she was out on leave.  As Sekula testified that he was not informed of the fee reversal until Plaintiff had begun her second FMLA leave, he was unable to contact her until her first day back at work.  Consequently, the court finds that the fact that Plaintiff was terminated two days after her return from FMLA leave does not create a causal connection.

Plaintiff focuses her argument on the second instance of temporal proximity, and argues that the reason *why* Sekula did not learn of the fee reversal until just before Plaintiff took FMLA leave is significant because, viewing all facts in Plaintiff's favor, Torres knew about the fee reversal two months prior to reporting it to Sekula, and it is undisputed that the fee reversal led directly to Plaintiff's termination.  In addition, Torres commented that Plaintiff should quit her job rather than take more FMLA leave and he warned her that the fee reversal "might come back to harm" her.  The court finds that Plaintiff's emphasis on Torres is misplaced because he did not participate in the

decision to terminate Plaintiff; only Barrett and Black were involved.  Plaintiff argues that the fact that Torres reported the fee reversal the same day that she filed her second FMLA leave suggests that his decision to report the incident was made in retaliation for her leave request.  However, Plaintiff has not shown any evidence that Torres would have been justified in *not* reporting the fee reversal to his superiors.  Even assuming that Torres had verbally reprimanded her, Barrett testified that he never would have accepted a verbal reprimand as the ultimate discipline for a fee reversal for an employee's relative.  Barrett also testified that he believed that all such violators were terminated, and that he had "always terminated employees in [his] chain of command for reversing fees for a relative."  (Barrett Aff. ¶ 10.)  Likewise, Black testified that any employees she dealt with who had reversed fees for a relative "always resulted in terminations, so I always recommended termination."  (Black Dep. at 33:1-7.)  Defendants further argue that Plaintiff knew that her sister was on the account on which she reversed the fee.  Plaintiff has not presented any evidence to contradict the fact that employees who reversed fees for a relative were always terminated.  Thus, at most, Torres' delay in reporting the fee reversal simply delayed the termination; it did not change the outcome.

Barrett testified that he based his decision to terminate Plaintiff solely on the fee reversal and that, at the time he made the decision, he was not aware of any of Plaintiff's complaints to Brilla or Torres.  (Barrett Aff. ¶ 9.)  Plaintiff has produced no evidence that Black discussed any of Plaintiff's complaints or FMLA issues with Barrett when she recommended termination.  Plaintiff has not presented any evidence to contradict Defendants' sworn testimony that the decision to terminate Plaintiff was based solely on her fee reversal and not on any issues surrounding her FMLA leave or complaints about Torres.

In response, Plaintiff argues that the bank had not been enforcing its other policies, thereby undermining Defendants' argument that they consistently enforce the fee reversal policy. Specifically, Plaintiff argues that the bank had not been enforcing its policy (and the law) regarding notarization as evidenced by Torres receiving no discipline for his attempt to have Plaintiff improperly notarize a document.  (*See* Pl.'s Opp'n Br. at 29.)  However, even construing all evidence in the light most favorable to Plaintiff, the fact that Defendants did not discipline Torres for attempting to violate a notary rule does not demonstrate that Defendants would not discipline Plaintiff for violating the fee reversal rule.  Nor does the fact that Plaintiff was not disciplined for opening the joint account for Rodriguez and King mean that Defendants would not discipline Plaintiff for violating the fee reversal rule.  Such speculations, absent admissible supportive evidence, are insufficient to warrant a denial of summary judgment.

Accordingly, Plaintiff has not shown that her termination was causally connected to her FMLA leave, and therefore she has failed to make her prima facie case.  As such, the court hereby grants summary judgment for Defendants on Plaintiff's retaliation claim based on Plaintiff's termination.

### 4. Defendants' Non-Discriminatory Reasons

As Plaintiff has made a prima facie showing of FMLA retaliation based on her performance review, Defendants must now rebut the prima facie case by "articulat[ing] a legitimate, non-discriminatory reason" for the performance review. *See, e.g.*, *Skrjanc*, 272 F3.d at 315.  Defendants argue that Plaintiff's negative performance review was fair, and that Plaintiff has not pointed to any evidence to the contrary.  (Defs.' Reply Br. at 5-6.)  The review indicates that Plaintiff received a "needs improvement" rating in six out of twenty-two categories.  (*See* Retail Banking Performance

-36-

Review.)  Defendants also point out that Plaintiff's memorandum to Black concedes that she agreed with the "needs improvement" rating in regard to two factors (pre-set sales and policy and procedure execution).  (Defs.' Reply Br. at 5; *see* Pl.'s Internal Mem. at 1.)  Defendants maintain that no part of the review was based on Plaintiff's use of FMLA leave.  (*Id.* at 9.)  Defendants also point out that the review "highlighted some of Plaintiff's positive attributes."  (Defs.' Reply Br. at 6) (listing comments from factors on which Plaintiff met expectations).  Accordingly, the court finds that Defendants have carried their burden of production by articulating a non-discriminatory reason for the negative performance review.

### 5. Plaintiff's Showing of Pretext and/or Motivating Factor

As Defendants have carried their burden to produce a "legitimate, non-discriminatory reason" for each adverse employment action, Plaintiff must now demonstrate that, despite Defendants' contentions otherwise, their true reasons for the performance review were discriminatory.  *Gibson*, 336 F.3d at 513-14.  Plaintiff can do this by showing either that Defendants' reason is a pretext or that discrimination was a motivating factor.

First, Plaintiff can show "that the articulated reason is in reality a pretext to mask discrimination." *Skrjanc*, 272 F3.d at 315 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Direct evidence is not required to establish pretext.  *Id.* (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000)).  Plaintiff can show pretext "in one of three ways: [1] by showing that the proffered reasons had no basis in fact; [2] by showing that the proffered reasons did not actually motivate [the adverse employment action]; or [3] by showing that the proffered reasons were insufficient to motivate [the adverse employment action]." *McConnell v. Swifty Transp., Inc.*, 198 Fed. Appx. 439 (6th Cir. 2006) (quotation omitted).  It is not sufficient to simply

-37-

allege that the relevant facts are disputed; Plaintiff must "demonstrate[] that the employer did not 'honestly believe' in the proffered non-discriminatory reason." *Id.* (quotations omitted).

Second, even if Defendants' non-discriminatory reasons partially explain the adverse actions, Plaintiff can succeed on her retaliation claim by showing that Defendants had mixed motives and that a discriminatory reason was a "motivating factor" in Defendants' decisions. *Gibson*, 336 F.3d at 513. To avoid liability, Defendants must then prove that they would have taken the actions even without the discriminatory reason. *Lampkin*, 2005 U.S. Dist. LEXIS 5451 at *4.

Plaintiff's evidence supports a showing of both the second and third methods of pretext as well as a showing of a "motivating factor" under the mixed-motive analysis. The record shows absences in the Fall of 2003 that Torres may have used in compiling Plaintiff's performance evaluation. These absences would have been improper to hold against Plaintiff, for if her FMLA paperwork had been processed earlier, these absences would have been approved. Moreover, of the twenty-one applicable categories in her review, Plaintiff received a rating of "needs improvement" in only six categories and a rating of "meets improvement" in fifteen categories. Consequently, Plaintiff has successfully raised a question as to whether Defendants' proffered reasons are either untrue or insufficient as a basis for her negative performance review, or whether instead Plaintiff's allegations of Torres' improper, harassing, and retaliatory behavior were the true reasons (or, alternatively, played a motivating factor in) Plaintiff's overall rating of "needs improvement."

Under the motivating factor analysis, Defendants can avoid liability if they can show that even without taking into account Plaintiff's absences in the Fall of 2003, Defendants would still have given her a poor performance review. Defendants do not expressly argue the motivating factor analysis on this issue, but they do emphasize that Plaintiff conceded that two of her poor ratings

were fair.  The court finds that this argument is not sufficient to overcome the potential role that the
Fall of 2003 absences played in the performance review.  Accordingly, the court finds that there is
a genuine issue of material fact regarding whether Defendants retaliated against Plaintiff by
improperly counting certain FMLA-related absences against her on her performance review.
Therefore, the court denies Defendants' motion for summary judgment as to Plaintiff's retaliation
claim based on her performance review.

### E.  Torres' Individual Liability

Defendants put forth two arguments in support of their contention that Torres cannot be held
individually liable in this action.  The court shall discuss each in turn.

### 1. Availability of Individual Liability

First, Defendants correctly point out that the Sixth Circuit has not yet determined whether
an individual employee in the private sector can be held liable as an employer under the FMLA.
(Defs.' Mot. for Summ. J. at 19.)  Although *Mitchell v. Chapman*, 343 F.3d 811, 831 n.22 (6th Cir.
2003), did not explicitly address liability for private employers, nevertheless it did refer, in a
footnote, to the Sixth Circuit's "prior determination that the FMLA extends individual liability to
private-sector employers."[16]  In other words, *Mitchell*'s holding that public agency employees *are*

---

[16]       The *Mitchell* court first points out that "[t]he FMLA expressly incorporates into
its provisions the Fair Labor Standards Act's ("FLSA") . . . definition of
'employee'" and that the FMLA's definition of employer mirrors that of the
FLSA.  *Id.* at 826-27.  The court then states that other Sixth Circuit decisions have
"interpreted the FLSA's . . . language to impose individual liability on
private-sector employers." *Id.* at 827.  Finally, the *Mitchell* court lists a string of
non-binding cases that hold that because the FLSA imposes individual liability on
private-sector employers, and because the FMLA's language mirrors the FLSA,
then the FMLA also imposes such individual liability.  *Id.* at 827-28.  At the same
time, the *Mitchell* court also emphasizes that only the question of public agency

*not* individually liable under the FMLA relies on an unidentified Sixth Circuit holding that private sector employees *are* individually liable.  The *Mitchell* court also states that the FMLA could impose individual liability on appropriate individuals, "such as corporate officers acting in the interest of an employer."  *Id.* at 832.  While *Mitchell* did not cite the case that made this prior determination, and no court since has been able to identify the case, *Mitchell* has been read by district courts in the Sixth Circuit as implicitly holding that individual liability exists.  *See, e.g.*, *Brown v. CBK*, 2005 U.S. Dist. LEXIS 31960, *11 (W.D. Tenn. Nov. 28, 2005).

In addition, the relevant regulation,  entitled, "What employers are covered by the Act?" expressly states that "[a]s under the FLSA, individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA." 29 C.F.R. § 825.104(d).  Furthermore, cases from this district also support this conclusion.  *See Carpenter v. Refrigeration Sales Corp.*, 49 F. Supp. 2d 1028, 1030 (N.D. Ohio 1999) (human resources manager is "employer" under FMLA and therefore liable); *Rupnow v. TRC, Inc.*, 999 F. Supp. 1047, 1048 (N.D. Ohio 1998) (company's president can be held liable under FMLA). Therefore, the court finds that both Sixth Circuit and Northern District of Ohio precedent establishes that individuals may be held liable under the FMLA.

<u>2. Whether Torres Is an Employer under the FMLA</u>

Defendants next argue that Torres does not constitute an employer under the FMLA because he had no responsibility, beyond ministerial tasks, to administer the FMLA, and he was not responsible for terminating Plaintiff.  (Defs.' Mot. for Summ. J. at 20; Defs.' Reply Br. at 14-15.)

_____

employers was squarely before the court.  *Id.* at 828.

Under the FMLA, an employer is "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."  29 U.S.C. § 2611(4)(A)(ii)(I).  Also, individual liability "arises under the FMLA when the supervisor 'exercise[s] sufficient control' over the employee's leave and employment status."  *Phillips v. Leroy-Somer N. Am.*, 2003 U.S. Dist. LEXIS 5334 (E.D. Tenn. Mar. 31, 2003) (denying summary judgment for three defendants who had conferred about terminating plaintiff).[17]

Courts easily find individual liability where the individual employer was a member of the Human Resources department; was responsible for the employer's FMLA compliance; or actually terminated the plaintiff.  *See, e.g.*, *Carpenter*, 49 F. Supp. at 1031 (holding individually liable an employer who was head of the human resources department, was charged with FMLA compliance, and who made the decision to terminate the plaintiff); *Bryant v. Delbar Prods., Inc.*, 18 F. Supp. 2d 799, 809 (M.D. Tenn. 1998) (holding manager individually liable on summary judgment where manager was in charge of all personnel responsibilities, including sometimes handling FMLA paperwork; had the authority to grant personal leave and excuse employees from work; and was directed to, and did, terminate the plaintiff – even though it was unclear whether he actually recommended termination).  Such facts, however, are not necessary to determine that liability may attach.

In *Brown v. CBK*, the court denied an employer's motion to dismiss because "[s]o long as [the individual defendant] possesses control *over the aspect of employment alleged to have been*

_____

[17]    The *Phillips* court noted that the plaintiff "concedes" that summary judgment is proper for her supervisor.  *Id.* at *2.  However, as this statement was made without discussion or explanation, this language cannot support summary judgment for Torres in the instant case.

*violated*, the FMLA will apply to that individual." 2005 U.S. Dist. LEXIS 31960, *18 (W.D. Tenn. Nov. 28, 2005) (quotation omitted).  In *Brown*, the plaintiff alleged that she had been fired in part for taking FMLA leave, and the relevant defendant, Pardue, was the manager who actually terminated the plaintiff.  *Id.* at *2-3.  Similarly, in the instant case, as her direct supervisor, Torres possessed control over initiating her FMLA paperwork and conducting her performance review. Thus, as in *Brown*, Torres possessed control over the aspects of Plaintiff's employment that she alleges have been violated.

> In addition, the *Brown* court stated that

>> Plaintiff has alleged a "set of facts" that might ultimately support a finding of individual liability against Defendant Pardue. . . . Although Plaintiff may ultimately fail to prove that Defendant Pardue's participation in the alleged violations was sufficient, that factual inquiry cannot be determined on a motion to dismiss for failure to state a claim.

*Id.* at *18.  In the instant case, the court finds that there is information from which a jury could reasonably conclude that Torres exercised control over the disputed aspects that survive summary judgment.  First, the court finds that Torres' involvement with the FMLA process was more than "merely ministerial" because he was able to singlehandedly initiate or delay the FMLA paperwork process.  Second, Torres was directly responsible for completing Plaintiff's performance review. For these reasons, the court finds that there is evidence from which a reasonable jury might conclude that Torres can properly be held individually liable for Plaintiff's remaining FMLA claims.  Whether he *is* liable in the instant case is a question of fact inappropriate for determination at this time. Therefore, Defendants' motion for summary judgment is denied as to Torres' individual liability.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 67) is

-42-

hereby granted in part and denied in part.  Specifically, as to Plaintiff's interference claim, summary judgment is denied as to Torres' delay in processing Plaintiff's FMLA request and granted as to Torres' alleged harassment of Plaintiff.  As to Plaintiff's retaliation claim, summary judgment is denied as to the negative performance review; granted as to Plaintiff's termination; granted as to Torres' alleged harassment of Plaintiff; and granted as to Defendants' failure to discipline Torres. In addition, summary judgment is denied as to Torres' individual liability.

A final pretrial conference will be held in the within case on May 2, 2007, at 2:00 p.m.  Trial shall commence on June 25, 2007, at 9:00 a.m.  A separate trial order shall issue.

IT IS SO ORDERED.

/s/ SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

March 23, 2007

-43-